FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 27, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DONALD B. HENDERSON,<br><br>Defendant. | NO: 2:16-CR-143-RMP<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY A NEW TRIAL |

This case is about Donald Henderson, a former serviceman who was injured in an accident while in the military. The Government does not contest that Mr. Henderson qualified for ongoing benefits from the Department of Veterans Affairs as a result of the permanent injuries that he suffered in the accident. However, the Government challenges the amount of the benefits that Mr. Henderson has received over the years and contends that Mr. Henderson was deceptive to Veterans Affairs and to the Social Security Administration to obtain more benefits than those to which he otherwise would have been entitled. Specifically, the Government alleges that Mr. Henderson's false statement to Veterans Affairs was

his submission of the written diagnosis by Dr. Harshman, a Veterans Affairs eye doctor, stating that Mr. Henderson was legally blind due to a permanent condition.

To support the Government's case regarding Mr. Henderson's alleged false statement, the Government called numerous witnesses over seven and a half days of trial to testify about what they observed Mr. Henderson doing, or heard him saying, during eye exams, in casual interactions, and while observing him surreptitiously. The Government's case hinged on comparing what its witnesses observed with those witnesses' conclusions about what a person can or cannot do who is legally blind due to keratoconus, one of Mr. Henderson's diagnosed conditions.

Mr. Henderson argues that the Government failed to provide sufficient evidence to prove that he intentionally made a false statement about being legally blind due to a permanent condition. The Court agrees.

Ultimately, the Court finds that the Government failed to meet its burden to prove by sufficient evidence that Mr. Henderson knowingly and willfully, with knowledge that his conduct was unlawful, made a false statement regarding either the permanence or the extent of his visual impairment. Therefore, the Court grants Mr. Henderson's motion for acquittal pursuant to Fed. R. Crim. P. Rule 29.

## LEGAL STANDARD

A district court must, on a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a

conviction." Fed. R. Crim. P. 29(a). The relevant inquiry "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Laney*, 881 F.3d 1100, 1108–09 (9th Cir. 2018). The jury's verdict is entitled to great deference. *United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007). "Sufficiency-of-the evidence review . . . should be independent of the jury's determination that evidence on another count was insufficient." *United States v. Powell*, 469 U.S. 57, 67 (1984). In other words, a jury acquittal on another count does not affect a court's consideration of the evidence supporting a defendant's counts of conviction. *United States v. Hart*, 963 F.2d 1278, 1282 (9th Cir. 1992).

In the event that a Court "enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1).

Mr. Henderson made a motion for judgment of acquittal at the end of the Government's case-in-chief, and the Court reserved ruling on that motion. Following the jury verdict, Mr. Henderson again moved for acquittal on the three counts of conviction. Where a court reserves decision on a motion for acquittal made at the close of the Government's case-in-chief, and returns to decide the

motion after a guilty verdict, the Court must decide the mid-trial motion on the basis of the evidence at the time the ruling was reserved.  Fed. R. Crim. P. 29(b).

## BACKGROUND

### *Counts of conviction*

The Government charged Defendant in Count 3 of the superseding indictment with concealing a material fact from the United States Department of Veterans Affairs (the "VA"), in violation of 18 U.S.C. § 1001(a)(1) from "on or about August 6, 2002 and continuing through on or about February 8, 2016" "by representing that his eye condition, keratoconus, caused him to be permanently blind with a best corrected visual acuity worse than 20/200."  ECF No. 165 at 2.  The superseding indictment labels Count 3 "False Statement to Veterans Affairs."  *Id.*

In Count 2, the Government charged Defendant with knowingly and willfully stealing and purloining more than $1000 of money and property from the Social Security Administration (the "SSA"), in violation of 18 U.S.C. § 641,"on or about August 16, 2011, and continuing through on or about June of 2016[.]"  ECF No. 165 at 2.  In Count 4, the Government charged Defendant with committing the same offense with respect to the VA from "on or about August 16, 2011, and continuing through on or about February 8, 2016[.]"  *Id.*

On September 22, 2017, at the conclusion of a trial that included seven and a half days of evidence and one and a half days of deliberations, a jury of twelve

ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY A NEW TRIAL ~ 4

acquitted Defendant Donald Henderson of Social Security fraud (Count 1),[1] and

convicted him of making a false statement to the VA (Count 3)[2] and theft of

money from the SSA (Count 2)[3] and the VA (Count 4). Defendant timely moved

for a judgment of acquittal, or, in the alternative, a new trial, on the latter three

counts. ECF Nos. 241, 257, and 258.

*Evidence from the Government's case-in-chief*

Benefits Applications and Determinations during the Pre-Indictment Period

The Government does not contest that Mr. Henderson was injured in a

motorcycle accident in 1984 while serving in the Army. Gov't Ex. 20 at 1. He

was unconscious for approximately ten to fifteen minutes following the accident,

---

[1] 42 U.S.C. § 408(a)(4) provides in relevant part: "Whoever . . . having knowledge of the occurrence of any event affecting (1) his initial or continued right to any payment under this title . . . conceals or fails to disclose such event with an intent fraudulently to secure payment either in a greater amount than is due or when no payment is authorized . . . shall be guilty of a felony . . . ."

[2] 18 U.S.C. § 1001(a)(1) provides in relevant part: " . . . whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . falsifies, conceals, or covers up by any trick, scheme, or device a material fact . . . shall be fined under this title, imprisoned not more than 5 years . . ., or both."

[3] 18 U.S.C. § 641 provides in relevant part: "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another . . . any record, voucher, money, or thing of value of the United States or of any department or agency thereof . . . shall be fined under this title or imprisoned not more than ten years, or both . . . ."

was immediately hospitalized in intensive care, and received surgery for an injury to his right hand.  *Id.*

According to the Government's exhibits, Mr. Henderson began experiencing debilitating headaches while in the hospital recovering from the accident.  *Id.*  His hospital records indicate that he suffered a head injury.  Gov't Ex. 17 at 10.  In 1986, Mr. Henderson was honorably discharged from the military.  Gov't Ex. 16; ECF No. 224 at 57.  At the time that he was released from military service, the VA granted Mr. Henderson a ten percent disability rating on the basis of his finger injuries.  Gov't Ex. 17.

The Government's witness, VA Rating Specialist Clinton David, testified about the VA disability rating system and the disability benefits that the VA awarded Mr. Henderson over the years.  Mr. David testified that in 1988, Mr. Henderson requested an increased disability rating for his finger injuries in combination with a disability determination for migraine headaches.  Gov't Ex. 18; ECF No. 226 at 213–14.  The VA denied the request because Mr. Henderson had not reported a head injury (traumatic brain injury or "TBI") at the time that he separated from the military.  ECF No. 226 at 216.  Mr. David testified that in 1991, Mr. Henderson sought reconsideration of his claim of disability for migraine headaches, submitting additional evidence.  ECF No. 226 at 218.  The VA again "denied service-connection" for the migraine headaches.  ECF No. 226 at 219.

By 1992, Mr. Henderson had moved to Spokane. Gov't Ex. 20 at 1–2. Mr. Henderson saw a VA doctor to complete a neurological disorder exam as part of his appeal of denial of benefits for migraine headaches. ECF No. 226 at 220. Defendant reported during that exam that he was missing ten to fifteen days of work yearly due to headaches and was experiencing severe headaches approximately two or three times each month. Gov't Ex. 20 at 2. He also reported that his headaches involved light sensitivity and nausea and that the headaches began shortly after his in-service motorcycle accident, during which he lost consciousness. ECF No. 226 at 222–23. In 1993, the VA reversed its previous decision and determined that Mr. Henderson was fifty percent disabled on the basis of his debilitating migraine headaches. ECF No. 226 at 225.

In 1995, Mr. Henderson sought an increased disability rating for his migraine headaches. ECF No. 226 at 228. The VA denied the request and maintained a sixty percent total disability rating.[4] Gov't Ex. 21; ECF No. 226 at 228–30. Mr. David testified that fifty percent disability was the maximum that a veteran could receive on the basis of migraine headaches under the ratings schedules. ECF No. 226 at 232; Gov't Ex. 23 at 1.

---

[4] The combined sixty percent rating reflected ten percent for his finger disability and fifty percent for his migraine headaches. ECF No. 226 at 230.

In 1996, Mr. Henderson's wife, Tamara Henderson, provided a statement in support of a new claim for disability for Mr. Henderson on the basis of symptoms of anxiety, depression, and opioid dependence related to medications that Mr. Henderson was prescribed for the migraine headaches. ECF No. 226 at 233; Gov't Ex. 22. Mr. David testified that the VA granted thirty percent disability for the secondary mental health symptoms that the Hendersons reported. Mr. David further explained that because of the way that the VA combines multiple partial disabilities, Mr. Henderson's total disability rating was raised to seventy percent. ECF No. 226 at 234.

In approximately April 1998, Spokane optometrist Brett Hagen, OD, diagnosed Mr. Henderson with the eye disorder keratoconus after reviewing corneal topography results depicting the shape of the front surface of Mr. Henderson's eyes. Gov't Ex. 27 at 12; ECF No. 229 at 190–91. In February 2000, Mr. Henderson sought service-connection and disability compensation for keratoconus. ECF No. 226 at 238. The VA denied service-connection for the keratoconus on March 30, 2000, but gave Mr. Henderson an opportunity to provide more medical evidence of a service-connection. ECF No. 226 at 240; Gov't Ex. 24 at 7.

In June 2001, the VA recalculated Mr. Henderson's disabilities and determined that going back to November 1, 2000, Mr. Henderson's "[a]nxiety neurosis with posttraumatic stress disorder and major depressive disorder" was

fifty percent disabling, rather than thirty percent, and Mr. Henderson's finger

injuries were twenty percent disabling, rather than ten percent. Gov't Ex. 25 at 1.

On July 18, 2001, Mr. Henderson was examined at the Spokane Eye Clinic

by Alan Johnson, OD, who described himself as an optometric physician. ECF

Nos. 223 at 103; 226 at 247. Using a standard Snellen eye chart for the

examination, Dr. Johnson determined Mr. Henderson's best-corrected visual acuity

on that day was 20/80 in his right eye and 20/100 in his left eye. Gov't Ex. 26 at

11–12. Dr. Johnson also determined, based on corneal topographies, that Mr.

Henderson's left eye was "moderately" affected by keratoconus while the

keratoconus in Mr. Henderson's right eye was "severe." ECF No. 223 at 220. By

December 2001, Dr. Hagen determined that Mr. Henderson's best attainable visual

acuity was 20/60 in both eyes and submitted that determination to the Washington

State Department of Licensing for purposes of vision ability for a driver's license.

Gov't Ex. 1 at 8. As a result, Mr. Henderson's driver's license was revoked due to

his visual impairment. Gov't Ex. 9 at 14.

In December 2001, Dr. Hagen referred Mr. Henderson to a local

ophthalmologist, Christopher Sturbaum, MD, to be evaluated for the suitability of

contact lenses to address Mr. Henderson's keratoconus and to explore the option of

corneal transplant surgery. ECF No. 224 at 124. Contradicting Dr. Johnson's

testimony, Dr. Sturbaum testified that based on Mr. Henderson's corneal

topographies from spring 2001, Mr. Henderson's keratoconus was "mild." ECF No. 224 at 127.

Dr. Sturbaum further testified that a physician cannot "predict somebody's vision based on just a topography . . . . There's more factors involved." ECF No. 224 at 130–31. Despite that disclaimer, Dr. Sturbaum postulated that Mr. Henderson's corneal topographies could be expected to result in a visual acuity as poor as 20/80. ECF No. 224 at 131. Dr. Sturbaum also testified that the medications that Mr. Henderson was prescribed and was taking at the time that Dr. Sturbaum examined Mr. Henderson in December 2001 can affect vision. ECF No. 224 at 169–70. With respect to the potential effects of TBI on Mr. Henderson's vision, Dr. Sturbaum testified that optometrists and ophthalmologists would not generally be treating TBI patients because TBI injuries are "not their area of expertise." ECF No. 224 at 156.

On January 8, 2002, the VA determined that the keratoconus was a service-connected condition and was thirty percent disabling beginning on October 25, 2000.[5] ECF No. 226 at 243. Therefore, according to the VA's formula of starting

_____

[5] The explanation for determining that Mr. Henderson's keratoconus was service-connected is included in Government's Exhibit 26 at 8 (emphasis added): "An evaluation of 30 percent is based on the evidence which shows that Mr. Henderson's eye condition; [sic] keratoconus, is related to difficulties with decreased vision and astigmatism, *which was reported while on active duty*. A higher evaluation is not warranted unless there is evidence which allows a decrease in visual acuities."

at 100 percent and accounting for each of a veteran's disabling percentages, by January 8, 2002, the VA calculated Mr. Henderson as ninety percent disabled beginning on October 25, 2000, and compensated him accordingly. Gov't Ex. 26 at 4; ECF No. 226 at 243–44.

On February 11, 2002, VA optometrist Thomas Riley, OD, examined Mr. Henderson for the first time and measured his visual acuities as 20/100 in both eyes. ECF No. 225 at 235. Mr. Henderson reported during his appointment that his vision "fluctuates on a regular basis." Gov't Ex. 27 at 16. Dr. Riley saw Mr. Henderson approximately on an annual basis from 2002 until 2013. Dr. Riley determined Mr. Henderson's visual acuity to be 20/100 on February 11, 2002, and 20/400 the next year. ECF No. 225 at 236. Dr. Riley testified that, "Based on the appearance of [Mr. Henderson's] eyes, the keratoconus had not progressed [between February 11, 2002, and January 13, 2003], and so the change in the visual acuity is not explained—explainable." ECF No. 225 at 236. Mr. Henderson again reported to Dr. Riley in 2004 that his vision "wildly" fluctuated. ECF No. 225 at 232. Dr. Riley further testified that he observed Mr. Henderson bumping into the wall as he arrived for an optometric exam, which is not characteristic of someone with keratoconus.[6] ECF No. 225 at 256–57.

_____

[6] Dr. Riley also opined, without any documentation, that he believed that he saw Mr. Henderson driving away from a local grocery store after Mr. Henderson observed him. ECF No. 225 at 241.

1     On March 27, 2002, the VA granted a request from Mr. Henderson for

2     "individual unemployability" benefits from March 11, 2002, meaning that although

3     Mr. Henderson's disabilities did not total 100 percent under the VA ratings system,

4     the VA recognized Mr. Henderson as having a combination of impairments severe

5     enough to prevent him from working, thereby justifying disability compensation as

6     though he were 100 percent disabled.  ECF No. 226 at 245; Gov't Ex. 27.  Mr.

7     David also testified that the VA "made [Mr. Henderson] permanent" at the time of

8     granting individual unemployability benefits.  ECF No. 226 at 251.

9     On July 5, 2002, more than three months after already being granted

10    "individual unemployability" status, Mr. Henderson was assessed by the VA

11    Visual Impairment Services Team "VIST" Coordinator Cheryl Sjoberg, MSW,

12    who recorded in her notes that Mr. Henderson was "most likely legally blind" but

13    needed a "definitive diagnosis."  Gov't Ex. 41 at 20–22.  VIST Coordinators are

14    social workers who guide veterans with vision disabilities through the disability

15    application process and identify appropriate services for which the veterans should

16    apply.  ECF No. 225 at 54–55.  Ms. Sjoberg's records indicate that Mr. Henderson

17    reported to her on July 5, 2002, that despite his impairment he was independent in

18    his activities of daily living, including housework, laundry, cooking, yardwork, and

19    child care.  Gov't Ex. 41 at 21.

20    ///

21    ///

<u>Benefits Applications and Determinations during the Indictment Period,</u>

<u>August 6, 2002, until February 8, 2016</u>

On approximately August 27, 2002, Mr. Henderson again applied for an increase of his service-connected VA benefits.[7] On a "Statement in Support of a Claim" form, signed and dated August 6, 2002, Mr. Henderson wrote:

> I am requesting an increase of my service connected disability due to my keratoconus eye disease. My latest eye appointment is attached and is highlighted with my current vision which is 20/400. I cannot tolerate contact lenses and the VIST coordinator at the Spokane VA Hospital told me that my vision is bad enough to be rated at 90% all by itself. I just had an eye exam at the VA hospital here in Spokane on 7/16/02 by Dr. Harshman. I included the notes from the exam to show my 20/400 vision and fact [sic] that I cannot tolerate any kind of contact lens. I also suffer from severe double vision and no vision at night. Because of this service connected disability eye disease I lost my driver's license and am classified as legally blind according to the VIST coordinator Cheryl C. Sjoberg. . . . Could you please increase my service connected disability for my keratoconus eye disease.[sic] Thank you.

Gov't Ex. 28 at 5–6.

Mr. Henderson appended a cover letter to his VA benefits application stating:

> I am writing to update my request for an increase is [sic] service connected disability due to my eye condition called Keratoconus. I am requesting that this service connected disability be classified as a total and permanent disability. My eye condition continues to regress.

---

[7] In Defendant's case, Ms. Sjoberg testified that she advised Mr. Henderson to apply both for increased service-connection benefits for keratoconus and for Social Security benefits. ECF No. 229 at 166–67.

I have already sent in my last eye examination results that was conducted at the Veteran's Administration hospital here in Spokane.

Gov't Ex. 28 at 8.

The examination results consisted of a statement signed by Douglas

Harshman, OD, and dated July 16, 2002:

Mr. Donald B. Henderson is legally blind due to Keratoconus, both eyes with best-corrected visual acuity of 20/400 both eyes. This is a permanent condition and not expected to improve.

Gov't Ex. 28 at 7. A copy of Government's Exhibit 28, at 7, is included here:



/ / /

The Government did not call Dr. Harshman or Ms. Sjoberg at trial, although Defendant called Ms. Sjoberg during his case.

On November 25, 2002, Mr. Henderson also applied for Social Security benefits, alleging that he had become unable to work on December 5, 2001. Gov't Ex. 41 at 1. Mr. Henderson stated in his application:

> I have an eye condition/disease called keratoconus which is progressive and I am now legally blind and does not get better, but has gotten worse over the last year. I have enclosed one form from Dr. Harshman which states this fact.

Gov't Ex. 41 at 63. Mr. Henderson submitted Dr. Harshman's July 16, 2002 diagnosis in support of his Social Security application. Gov't Ex. 28 at 7.

Mr. Henderson's applications for disability benefits on the basis of keratoconus and his permanent condition of legal blindness were granted by the VA on September 26, 2002, and by the SSA on February 19, 2003. Gov't Exs. 28 at 1–4; 41 at 67–68; ECF No. 228 at 30–32. Mr. David testified that the VA based its determination on Mr. Henderson's representation that his condition had worsened and on Dr. Harshman's July 16, 2002 VA diagnosis that said, according to Mr. David, that "based on whatever testing that they completed, he's at 20/400." ECF No. 228 at 33.

<u>Investigation</u>

VA Special Agent Marcus Munn testified that in 2012 he first focused his attention on Mr. Henderson in the course of conferring with Dr. Riley on a

different case.  ECF No. 224 at 49.  After advising Dr. Riley of the "obligation to

report to the inspector general information about fraud, waste, and abuse," Agent

Munn received a lead from Dr. Riley, the content of which was unspecified at trial,

that precipitated Agent Munn's investigation of Mr. Henderson.  *Id.*  Agent Munn

confirmed that the VA had rated Mr. Henderson as 100 percent disabled for both

eyes, and subsequently drove to Mr. Henderson's house in June 2012, where he

observed Mr. Henderson working in his garden, walking along a low retaining

wall, and picking things out of a raised bed.  ECF No. 224 at 52.  Agent Munn also

surreptitiously observed Mr. Henderson waiting at a VA bus stop on the day of a

dental appointment.  ECF No. 224 at 88.

In addition, Agent Munn contacted the VA dentist who treated Mr.

Henderson and learned that Mr. Henderson had sent the dentist a gift card and

thank you card, which thanked the dentist for "giving [Mr. Henderson his] smile

back" and stating that "if you ever want to go out and shoot, just give me a call."

ECF No. 224 at 91.  A second VA Special Agent, Jason Farrell, accepted Mr.

Henderson's invitation under the guise of being the nephew of Mr. Henderson's

dentist and went to a shooting range with Mr. Henderson on November 27, 2012.

ECF No. 224 at 95.

Agent Farrell testified that he saw Mr. Henderson quickly locate ammunition

in containers in Defendant's garage; that Mr. Henderson gave him directions as

Agent Farrell drove to the gun club; that he received detailed feedback from Mr.

Henderson about what targets Agent Farrell was hitting at the shooting range; and that he saw Mr. Henderson accurately shoot targets at a range of 21 feet. ECF No. 226 at 906–09.

For a nearly three-month period from March 22, 2013, until June 11, 2013, Agent Munn recorded video from a covert surveillance camera placed across the street from Mr. Henderson's house, which activated when motion was detected in front of the residence. ECF No. 224 at 106–07. The Government offered videos recorded from March 24, 2013, until April 17, 2013, showing Mr. Henderson exiting a vehicle from the passenger side, backing a vehicle out of the garage, operating a keypad to open his garage, walking across the street, mowing the lawn with both a push and ride-on lawnmower, trimming the edges of the lawn, adjusting the sprinkler system, receiving a pizza delivery, and avoiding a hanging branch, all while not falling or bumping into things. ECF No. 224 at 108–12, 194–210; Gov't Exs. 74–95. In response to the Government's question, Agent Munn denied that he "ever [saw Mr. Henderson] using a white stick or a cane." ECF No. 224 at 217.

When Agent Munn advised VA authorities about his investigation, the VA scheduled a "compensation and pension exam" for Mr. Henderson with Dr. Johnson to evaluate the severity of Mr. Henderson's claimed disability. ECF No. 224 at 210. With the consent of Dr. Johnson and his staff, Agent Munn covertly recorded the exam on May 30, 2013; watched Mr. Henderson leave the exam

room; and arranged for an undercover agent to record Mr. Henderson leaving the clinic building.  ECF No. 224 at 211–13.

Dr. Johnson testified that during the exam Mr. Henderson reported double vision as a symptom that he had been experiencing.  Dr. Johnson confirmed corneal irregularity in Mr. Henderson's eyes through "objective testing," which "would be consistent with the double vision difficulties."  ECF No. 223 at 162–63. Dr. Johnson testified that the double vision likely would occur "occasional[ly], daily depending upon task and lighting."  ECF No. 223 at 166.  Dr. Johnson also confirmed that the 2013 corneal topographies of Mr. Henderson's eyes were not significantly different from the 2001 corneal topographies.  ECF No. 223 at 170. Based on the lack of change in the topographies, Dr. Johnson concluded that Mr. Henderson's keratoconus was moderate in one eye and severe in the other.  ECF No. 223 at 158, 169–70, 220.

Dr. Johnson also testified that many of the symptoms that are characteristic of TBI overlap with the symptoms of keratoconus, but "the challenge with TBI is it's sometimes that you don't see physical findings."  ECF No. 223 at 187.  Dr. Johnson testified that he had not reviewed Mr. Henderson's medical records other than his Spokane Eye Clinic file and had not considered whether Mr. Henderson's vision was impacted by TBI or the medications that Mr. Henderson had taken within a day of the exam.  ECF No. 223 at 173, 188–89, 196–97.

The Government also presented lay witnesses who testified about what they had observed or been told that Mr. Henderson could and could not do. In addition, the Government presented testimony from SSA Program Expert Christine Vu that to qualify for Social Security disability benefits, an individual needs to have an impairment that lasts for a "continuous period of 12 months." ECF No. 226 at 112. Ms. Vu continued, "And so even though the listing fluctuates, it didn't last 12 months." *Id.* Ms. Vu further generated a list of "functions [that Mr. Henderson could carry out] that are not consistent with an individual who is statutorily blind." ECF No. 226 at 124. At the top of the list was: "The claimant does not use assistive aid, such as a cane or a guide dog." *Id.*

***Evidence from Defendant's case***

Defendant called eleven witnesses. ECF No. 214-2. Defendant's key medical witness was William Hills, MD, OD, a neuro-ophthalmologist who had practiced as an optometrist before going to medical school to obtain his MD. ECF No. 227 at 12–13. Dr. Hills testified that he diagnosed Mr. Henderson as having TBI in addition to keratoconus. ECF No. 227 at 155. Dr. Hills further testified that Mr. Henderson has a neurologic condition called light-near dissociation that occurs in some patients after TBI. ECF No. 227 at 82. Dr. Hills examined Mr. Henderson's eyes with a pupilometer and determined on an objective basis that his pupils dilate and constrict faster than normal, a reaction that a patient cannot manipulate. ECF No. 227 at 82–83.

Dr. Hills also testified that Mr. Henderson's prescribed medications could have affected his vision by causing double vision and dry eyes, among other side effects. ECF No. 227 at 100–10. Dr. Hills testified that visual acuity testing using the Snellen eye chart is subjective, not only due to its reliance on the patient's responses, but also because the results depend on how persistently the examiner asks the questions and follows up regarding vague responses. ECF No. 227 at 199. In addition, the conditions of the space in which the exam is administered and whether the Snellen charts have been calibrated, as well as other factors such as lighting, can affect the accuracy of the results. ECF No. 227 at 197–200.

Dr. Hills opined that Mr. Henderson's baseline level of vision is 20/200. ECF No. 227 at 257. "If he squints, maybe he could get better. If the lighting conditions are just right, maybe he's better." *Id.* Although Mr. Henderson was able to "get down to 20/70" during his exam with Dr. Hills, according to Dr. Hills, that visual acuity is not sustainable. ECF No. 227 at 257–58.

At defense's request, Dr. Hills engineered eyeglasses for himself to simulate both 20/200 and 20/400 (with double vision) visual acuity in his own eyes to demonstrate his ability to perform the same activities that Mr. Henderson was observed performing. ECF No. 227 at 150. With his vision impaired to 20/200, Dr. Hills was able to shoot a gun with similar accuracy and at the same distance as Mr. Henderson did during the outing with Agent Farrell. ECF No. 227 at 150–52, 192, and 253. With his vision impaired to 20/400, Dr. Hills was able to perform

yardwork similar to Mr. Henderson's recorded yardwork, catch a Frisbee, and back Defendant's vehicle out of his garage without incident, as Mr. Henderson had been observed doing.  ECF No. 227 at 257.

The Government submitted Ms. Sjoberg's notes that were entered into the VA system following Mr. Henderson's 2004 annual VIST review.  Gov't Ex. 9 at 13–14.  When Defendant called Ms. Sjoberg as a defense witness, she testified that the Government omitted one page of her notes in its Exhibit 9.  ECF No. 229 at 159.  The omitted page documents that, during the 2004 VIST review with Ms. Sjoberg, Mr. Henderson informed her that he rides a bicycle "when his vision is better" and slowly completes business activities for the household such as paying bills and going grocery shopping, among other activities of daily living that he performs independently.  Def. Ex. 1171.

Ms. Sjoberg also testified at trial that she has 20/400 vision.  ECF No. 229 at 168-69.  In response to a question by the Government during cross examination, Ms. Sjoberg testified that she could see the center "X" on the same target that Mr. Henderson shot while with Agent Farrell at a similar distance and without her glasses.  ECF No. 229 at 180.

/ / /

/ / /

/ / /

/ / /

# DISCUSSION

## *Whether sufficient evidence supports the verdict under Fed. R. Crim. P. Rule 29*

The Court focuses its analysis on Count 3, regarding the false statement to the VA, as the predicate issue in this case.[8]  If the evidence is insufficient to support the false statement count, the remaining two theft counts necessarily collapse.  Counts 2 and 4 rely on Mr. Henderson's alleged false statement about his visual impairment to support that Defendant was knowingly and willfully depriving the government of money by receiving benefits specific to his vision problems.

In Count 3 of the superseding indictment, the Government charged Mr. Henderson with violating 18 U.S.C. § 1001 by concealing a material fact through a trick, scheme, or device "by representing that his eye condition, keratoconus, caused him to be permanently blind with a best corrected visual acuity worse than 20/200 . . . ."  ECF No. 165 at 2.  Neither the superseding indictment nor the Government's proposed jury instruction for Count 3 specified the means by which Defendant concealed a material fact from the VA.  However, during argument for the Rule 29 motion, the Government argued that Mr. Henderson made a false

---

[8] The Court analyzed the Government's case-in-chief separately from the evidence at post-verdict and concluded that there is insufficient evidence to sustain Defendants' convictions under Fed. R. Crim. P. Rule 29 at both mid-trial and post-verdict.

statement by submitting Dr. Harshman's July 16, 2002 diagnosis to the VA, representing that Mr. Henderson was legally blind due to a permanent condition. *See* Gov't Ex. 28 at 7. The Government framed their case throughout trial and in post-trial proceedings as Mr. Henderson's proffering a false statement to the VA to secure benefits, rather than concealing a material fact through a trick, scheme, or device, which the Court notes is the language in a different section of 18 U.S.C. §1001 from the section that was charged. *Compare* 18 U.S.C. § 1001(a)(1) *with* (a)(2); ECF No. 165.

The Ninth Circuit has interpreted 18 U.S.C. § 1001 as existing "to prevent . . . the willful submission to federal agencies of false statements calculated to induce agency reliance or action . . . ." *Brandow v. United States*, 268 F.2d 559, 565 (9th Cir. 1959) (internal quotation omitted). To secure a conviction for making a false statement under 18 U.S.C. § 1001, the Government must prove five elements: (1) a statement; (2) falsity; (3) materiality; (4) specific intent; and (5) agency jurisdiction. *United States v. Boone*, 951 F.2d 1526, 1544 (9th Cir. 1991).[9]

---

[9] In the specific context of a perjury defendant who contends that he made no false statement, a court weighing acquittal asks whether "the jury could conclude beyond a reasonable doubt that the defendant understood the question as did the government and that, so understood, the defendant's answer was false." *United States v. Camper*, 384 F.3d 1073, 1075 (9th Cir. 2004) (quoting *United States v. Sainz*, 772 F.2d 559, 562 (9th Cir. 1985) (internal quotation marks omitted).

Courts have found the elements specific to section (a)(1) of 18 U.S.C. §1001 require: (1) that the defendant had a duty to disclose material information; (2) the defendant falsified, concealed, or covered up such a fact by trick, scheme, or fraud; (3) the falsified, concealed, or covered up fact was material; (4) the falsification and/or concealment was knowing and willful; and (5) the material fact was within the jurisdiction of the Executive Branch. *United States v. White Eagle*, 721 F.3d 1108, 1116 (9th Cir. 2013).

The materiality element is satisfied if the statement has a "natural tendency to influence the decisions of the [agency]." *Kungys v. United States*, 485 U.S. 759, 772 (1988). To prove a "scheme, trick or device," the government must show that defendant engaged in an affirmative act to conceal information that the defendant has a legal duty to disclose. *United States v. Mubayyid*, 658 F.3d 35, 70 (1st Cir. 2011); *see also White Eagle*, 721 F.3d at 1117. Simple omissions fall short of affirmative acts. *Mubayyid*, 658 F.3d at 70.

Without objection from either party, and consistent with the Government's proposed jury instruction regarding Count 3, *see* ECF No. 159 at 18, the Court instructed the jury as to the false statement count:

> First, from on or about August 6, 2002, and continuing through on or about February 8, 2016, the defendant, Donald B. Henderson, made a false statement in a matter within the jurisdiction of the United States Department of Veterans Affairs;

Second, the defendant acted willfully, that is deliberately and with knowledge that the statement was untrue and that his conduct was unlawful; and

Third, the statement was material to activities or decisions of the United States Department of Veterans Affairs.

A statement is material if it could have influenced the agency's decisions or activities.

The jury must be unanimous as to what the false statement was and the date of the false statement.[10]

ECF No. 211 at 8.

The Court addresses, in turn, each element that the Government was required to prove beyond a reasonable doubt.

Statement

Although the jury was instructed that they needed to reach unanimity regarding which statement or statements were the false statements, no special verdict form or interrogatory to the jury was used. ECF Nos. 211 at 8; 219. Therefore, it is unclear upon which statement the jury based its verdict.

When the Court pressed the Government at the hearing on the motions for acquittal or new trial as to what Mr. Henderson's alleged false statement was, the Government averred that the "false statements" were Dr. Harshman's July 16,

---

[10] The Court added the unanimity portion of the instruction and removed the Government's proposed language that "the determination of veteran disability compensation is within the jurisdiction of the Veteran [sic] Department of Veterans Affairs, an agency of the United States." *See* ECF No. 159 at 18.

1  2002 diagnosis and Mr. Henderson's accompanying statements every time he

2  submitted the diagnosis in an application to obtain benefits. In closing argument at

3  trial, the Government characterized Dr. Harshman's July 16, 2002 diagnosis as the

4  line of demarcation between when Defendant was "legally receiving disability

5  benefits to illegally receiving disability benefits." ECF No. 230 at 35. However,

6  as an initial issue, the Court questions whether Dr. Harshman's diagnosis may be

7  imputed to Mr. Henderson as a statement simply because Mr. Henderson submitted

8  the document from a VA doctor in support of his claims for VA benefits.

9      The Court acknowledges a Fourth Circuit case in which an appellate court

10  accepted a medical practitioner's diagnosis as the defendant's "false statement" for

11  purposes of 18 U.S.C. § 1001. However, that case differs in key respects from the

12  instant matter. In that case it was undisputed that the defendant-veteran was never

13  deployed outside of the United States, yet he represented to a psychologist that his

14  wartime experiences in Southeast Asia resulted in severe physical injuries and

15  PTSD. *United States v. Hamilton*, 699 F.3d 356 (4th Cir. 2012). The element of

16  falsity was established. *Id*. Furthermore, the psychologist testified at trial about

17  the defendant-veteran's statements during the examination and what effect the

18  defendant-veteran's statements had on the psychologist's diagnosis. *Id.* at 360.

19  Therefore, there was evidence in the form of the psychologist's testimony that

20  supported the causal relationship between the veteran-defendant's statements and

21

the psychologist's diagnosis. *See id*. at 360–61. In this case, neither Dr. Harshman

ever testified.

Here, although the Government's case relies on the alleged false statement

represented by Dr. Harshman's diagnosis, the Government presented no evidence

about the specific questions asked of Mr. Henderson during the July 2002

examination, no evidence about Mr. Henderson's responses to those questions, and

no evidence about a causal connection between Mr. Henderson's responses and Dr.

Harshman's diagnosis. *See* Gov't Ex. 41 at 19. There was no evidence presented

about what led Dr. Harshman to his diagnosis. The Government failed to provide

any evidence to establish a nexus between Dr. Harshman's diagnosis and any of

Mr. Henderson's statements that could be construed as Mr. Henderson's making a

"false" statement to elicit Dr. Harshman's diagnosis and no evidence that could be

construed as Mr. Henderson's acting in furtherance of a trick, scheme, or fraud.

In addition, the Court finds that the sentence construction of Dr. Harshman's

diagnosis leaves the meaning of Dr. Harshman's statement ambiguous in a way

that undermines the Government's theory that Mr. Henderson knowingly made a

false statement when he relied on it. Exhibit 28, at 7, is included here:



DEPARTMENT OF VETERANS AFFAIRS
Medical Center
North 4815 Assembly Street
Spokane WA 99205-6197

In Reply Refer To:

July 16, 2002

Mr. Donald B. Henderson
is legally blind due to
Keratoconus, both eyes
with best-corrected visual
acuity of 20/400 both eyes.
This is a permanent
condition and not expected
to improve.

_____, O.D.
Douglas A. Harshman, OD

28-007                              0625

Dr. Harshman's diagnosis states in the first sentence: "Mr. Donald B.
Henderson is legally blind due to Keratoconus, both eyes with best-corrected
visual acuity of 20/400 both eyes." *Id.* (repetition of "both eyes" in original). The
second sentence states: "This is a permanent condition and not expected to
improve." *Id.* The word "this" in the second sentence is an unclear referent and
leaves the statement ambiguous as to whether the antecedent that "this" refers back
to is "keratoconus," or "best-corrected visual acuity of 20/400 both eyes," or both
"keratoconus" and "best-corrected visual acuity of 20/400 both eyes."

All of the evidence in this case supports that keratoconus is a permanent condition in the sense that it is chronic and not reversible; the condition either progresses or remains stagnant. *See* ECF Nos. 223 at 127 (Dr. Johnson); 226 at 27 (Dr. Spitz). The evidence submitted by both parties supports that Mr. Henderson repeatedly explained to every VA and non-VA examiner that his vision fluctuated throughout the day and from day to day. *See* Gov't Exs. 27 at 16; 41 at 18; 41 at 29; ECF Nos. 225 at 23, 27, 232; 224 at 160; 227 at 157.

To support the Government's allegations that Mr. Henderson's submission of Dr. Harshman's diagnosis was false, Dr. Harshman's statement would have to be interpreted as meaning that Mr. Henderson's "best-corrected visual acuity of 20/400 both eyes" was permanent, or in other words, that Mr. Henderson's visual acuity was never better than 20/400. However, neither interpretation is supported by the evidence.

First, the Government submitted no evidence to support that an optometrist would characterize a best-corrected visual acuity as a "condition." Second, Mr. Henderson submitted Dr. Harshman's note to the VA with an accompanying note stating in relevant part: "My latest eye appointment is attached and is highlighted with my *current* vision which is 20/400." Gov't Ex. 28 at 5 (emphasis added). Third, in his accompanying cover letter, Mr. Henderson wrote: "I am writing to update my request for an increase is [sic] service connected disability due to my eye condition called Keratoconus. I am requesting that this service connected

disability be classified as a total and permanent disability. My eye condition continues to regress." Gov't Ex. 28 at 8. The evidence does not support that Mr. Henderson ever stated that his visual acuity of 20/400 or 20/200 was permanent.

In short, the Government's theory of the case depends on interpreting "permanent" as modifying "visual acuity of 20/400" in Dr. Harshman's diagnosis, rather than "permanent" modifying "keratoconus." Count 3 of the superseding indictment charged Mr. Henderson with representing that keratoconus caused him to be "permanently blind with a best corrected visual acuity worse than 20/200 . . . ." ECF No. 165 at 2. However, the Government presented no evidence that Mr. Henderson ever stated that he was permanently blind, despite the Government's repeated assertions during opening statement and closing argument that Mr. Henderson made that statement.[11] The plain language of Dr. Harshman's note does not support an interpretation that he is diagnosing permanent blindness. Mr. Henderson's own statements accompanying the note claim a "permanent condition" or "permanent disability" but not "permanent blindness."

---

[11] In the Government's opening statement, the prosecution repeated twelve times the assertion that Mr. Henderson had stated or represented that he was "permanently blind." ECF No. 223 at 29–51. The Court overruled Defendant's objection to the first assertion as misrepresenting the evidence because the Government represented at sidebar: "Your honor, in support of his application, he provided medical evidence to both agencies that said he was permanently blind." ECF No. 223 at 29. At this stage of the proceedings, the Court has not found any evidence that Mr. Henderson made a statement that he was "permanently blind."

1 <u>Falsity</u>

2 Even if Dr. Harshman's diagnosis is viewed as Mr. Henderson's statement,

3 the Government still must prove that Mr. Henderson submitted the statement

4 knowing it to be false. The Government argues that it does not need to provide any

5 evidence to rule out other causes of Mr. Henderson's visual impairment because

6 causation is not an element of making a false statement. ECF No. 252 at 37.

7 However, two elements of the false statement offense that must be proved beyond

8 a reasonable doubt are that the statement was false and that Defendant made the

9 false statement intentionally.

10 At trial, the Government set up a faulty logical construct for the jury. The

11 Government argued that either Mr. Henderson's impaired eyesight was caused

12 solely by keratoconus, or that Mr. Henderson was lying about the extent of his

13 impairment. The Government then proceeded to present evidence from its

14 witnesses that keratoconus alone would not cause the extent of Mr. Henderson's

15 impairment. The Government argued that, given the testimony of Dr. Sturbaum

16 that keratoconus likely compromised Defendant's visual acuity only "up to 20/80,"

17 the remainder of Defendant's impairment must have been fabricated by Mr.

18 Henderson. *See* ECF No. 224 at 336. However, the Government's evidence was

19 insufficient to support their premise; the Government failed to provide a rule-out

20 diagnosis to prove that Mr. Henderson's visual impairment could only be caused

21 by keratoconus. Evidence was presented that causes other than keratoconus

existed for Mr. Henderson's impairment, including TBI, prescribed medications, and light-near dissociation.  Therefore, the Government failed to prove the validity of their premise that Mr. Henderson was fabricating the extent of his impairment.

None of the Government's medical experts reviewed all of Mr. Henderson's voluminous medical records before opining on the cause or extent of Mr. Henderson's visual impairments:

- Dr. Johnson reviewed only Spokane Eye Clinic records and Mr. Henderson's responses to the patient questionnaire.  ECF No. 223 at 189–92.  Dr. Johnson did not investigate whether TBI could be causing some of Mr. Henderson's symptoms affecting his visual acuity because Mr. Henderson did not bring up his TBI on the patient questionnaire in 2013 or during the 21-minute examination on May 30, 2013.  Dr. Johnson, who is an optometrist, not a neurologist, did not observe physical indications of TBI.  ECF No. 223 at 196.  However, Dr. Johnson also acknowledged that TBI does not always manifest itself in physical symptoms.  ECF No. 223 at 187-195.

- Dr. Sturbaum, an ophthalmologist, did not review the majority of Mr. Henderson's medical records, including his VA and Group Health records.  ECF No. 224 at 168.

- Dr. Spitz, an ophthalmologist, did not examine Mr. Henderson nor review Mr. Henderson's medical records "not related to eye care" because "[h]e applied for disability based on a visual impairment and not migraine or neurological impairment." ECF No. 226 at 52.

Although the Government's witnesses who diagnosed Mr. Henderson with varying visual acuity and keratoconus did not review the bulk of Mr. Henderson's medical records, they did not base their reports solely on Defendant's self-reports. Some of the witnesses also viewed corneal topographies and conducted physical examinations. The witnesses testified that their assessments of what was causing Mr. Henderson's impaired visual acuity were based on their training and experience. However, the Government's experts disagreed about what the medical experts were qualified to opine. For instance, Dr. Spitz, an ophthalmologist, testified that Dr. Johnson, another Government witness, was unqualified to render an opinion on the severity of Mr. Henderson's keratoconus because Dr. Johnson was an optometrist, not an ophthalmologist. *See* ECF No. 226 at 42–43.

Therefore, if a condition other than keratoconus was causing additional impairments, there is no evidentiary basis to conclude that Mr. Henderson knowingly and intentionally submitted a false statement for purposes of criminal liability, but rather repeated a diagnosis from a VA treatment provider, Dr.

Harshman, without Mr. Henderson's having any basis for knowing whether or not the diagnosis was accurate.

Furthermore, the Government never disputes that Mr. Henderson was partially disabled by keratoconus, at least up to thirty percent, beginning in 2000. *See* ECF No. 226 at 243. Nor does the Government dispute that Mr. Henderson qualified for additional VA benefits because of his migraine headaches. Instead, the Government has charged Mr. Henderson with making false statements that his vision was permanently 20/200 or worse because of keratoconus.[12]

As previously discussed, the Government presented no evidence that Defendant ever said that his vision was permanently 20/200 or worse because of keratoconus. Rather, the evidence supports that Mr. Henderson consistently stated to his providers that his visual acuity fluctuated, sometimes better, sometimes worse. *See* Gov't Exs. 27 at 16; 41 at 18, 29; ECF No. 225 at 232. And his providers noted findings of fluctuating vision. ECF Nos. 225 at 53; 224 at 162. As Dr. Hills testified, fluctuation of acuity in Mr. Henderson's situation is expected and consistent with his conditions, including TBI. ECF No. 227 at 157.

---

[12] In closing argument, the Government stated, "What we're saying is that [Mr. Henderson] made a false statement or representation regarding his keratoconus when he told both the VA and the SSA, 'I have keratoconus. It's affecting my vision,' and he submits to both agencies which indicates he's 20 over 400 permanently. So, yes, he has migraines. Yes, he's being compensated for them. But that's not what he's being charged for. He's being charged for making misstatements with respect to his keratoconus." ECF No. 230 at 100.

ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY A NEW TRIAL ~ 34

As evidence that Mr. Henderson was intentionally making false statements to the VA and the SSA, the Government relied on the inconsistent Snellen exam results showing that his eyesight was not permanently 20/400.  *See* ECF No. 230 at 100 (Government argued in closing that Mr. Henderson submitted "to both agencies the medical evidence which indicates he's 20 over 400 permanently."). However, the Government mistakenly conflates two disparate concepts into one idea: the first being "legally blind" due to a permanent condition of fluctuating acuity, and the second being "permanently blind."  The Government provides no basis on which to equate those terms, and the Court does not accept those terms as equivalents.  Rather, the evidence supports that Mr. Henderson consistently reported that his ability to see fluctuated, and his providers consistently diagnosed him with keratoconus, which is undisputed to be a permanent condition.

There is no evidence to indicate that Mr. Henderson was untruthful in reporting his condition.  A permanent condition is a different concept from permanent acuity.  The evidence supports that Mr. Henderson suffers from a permanent condition of fluctuating acuity, and that is what Mr. Henderson consistently reported to the VA.

Without giving the lay jurors the expert testimony that they needed to understand what functions a person with Mr. Henderson's conditions could be expected to perform, the Government called numerous witnesses to testify as to what they had observed or heard about Mr. Henderson's activities.  Those lay

witnesses opined, without any basis for their opinions, as to what someone who is "blind" should or should not be able to perform. For example, the Government's direct questioning of the VA investigator, Agent Munn, is illustrative of the speculation that the Government invited from its witnesses, and ultimately of the jury:

> Witness: [From the street outside Mr. Henderson's home on June 15, 2012] I observed, uh, Mr. Henderson, uh, in the side yard and back yard of the residence working in the garden.

> Government: And was there anything that was suspicious to you?

> Witness: Uh, well, at the time, I knew that he was, uh, rated for loss of use of both eyes at 100 percent. And so when I watched him, he was working in the garden, walking along his retaining wall. The garden had a raised bed, and he was working and gardening and picking things out of the garden.

> Government: Now, when you say he was rated for loss of both eyes at 100 percent, what does that – what does that mean to you? What was your understanding of what that meant?

> Witness: My expectation would have been that, uh, he would have been blind, uh, that I would have expected to have seen some sort of overt sign of blindness if I – if I saw him outside.

> Government: Did you see any overt sign of blindness?

> Witness: No.
> . . .

> Government: [During the "fifteen minutes or so" that you observed Mr. Henderson on June 15, 2012], did you ever see him—maybe someone helping him, guide him in the yard or in the garden?

> Witness: No.

ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY A NEW TRIAL ~ 36

Government: Did you ever see him use, say, a white cane to assist him?

Witness: No.

Government: Did you ever see him fall or stumble while you were watching him?

Witness: No, I did not.

ECF No. 224 at 52–54.

The Government did not establish that Agent Munn had the qualifications to opine on what indicia of legal blindness are observable from a considerable distance. The Government did not ask Agent Munn, even as a lay witness, to define an "overt sign of blindness," and where he derived that understanding of what "blindness" looks like. There also is no evidence that a person with the visual acuity that Mr. Henderson claimed for purposes of obtaining benefits would require a guide or a white cane or would fall or stumble while engaging in work in his own yard.[13]

---

[13] In fact, the Government's Exhibit 9, at 14, reflects that the VA VIST coordinator issued Mr. Henderson a white cane in 2004 for "identification" purposes only while using public transportation or in other contexts where he needed to convey that he required extra help due to his limited vision. The VA advised Mr. Henderson that the cane he was issued "is not appropriate for either support or orientation and mobility due to its small size." Gov't Ex. 9 at 14.

ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY A NEW TRIAL ~ 37

Similarly, Government VA ratings expert Mr. David testified regarding his review of the VA's "fraud case" that resulted in a termination of some of Mr. Henderson's VA benefits as follows:

> Witness: When I—um, when I review [sic] the case, I felt that the claimant was not qualified for disability or was statutory [sic] blind.
>
> Government: And what did you base that opinion on?
>
> Witness: I based it on the medical evidence, because the—what the claimant say[sic]—when the—I'm sorry. When Mr. Henderson apply—uh, apply for disability [sic], he alleges, um, blindness due to his vision—visual disorder. But with a review of the evidence, it shows us he's able to perform many functions, many activities that a, uh, blind person would not be able to do. And we also had exams in file [sic] that does not show his visual acuity meets the listing levels.

ECF No. 226 at 107. However, the Government provided no evidence that a person with the vision problems asserted by Mr. Henderson could not perform the functions that he appeared to be able to do based on the VA file, and the Government did not establish a basis for finding that Mr. David had any expertise on a statutorily blind person's capabilities. The testimony from SSA program expert Ms. Vu that she expected an individual who is statutorily blind to use an "assistive aid, such as a cane or dog" suffers from the same defect. ECF No. 226 at 124.[14]

_____

[14] Ms. Vu also testified that the Social Security medical listing addressing loss of visual acuity categorizes an individual whose visual acuity is 20/400 as disabled to the same degree as an individual "who has no eyeballs," in the Government's words. ECF No. 226 at 112. Nonetheless, that regulatory categorization is not evidence to support that an individual who is "legally blind due to [k]eratoconus,

In sum, the Government relies on a plethora of circumstantial evidence regarding Mr. Henderson's activities (gardening, backing a car out of the garage, and hobby shooting) to imply that Mr. Henderson must have been malingering when he responded to questions during eye examinations. However, the Government provided no expert evidence that a legally blind person with a permanent condition could not perform those activities. There was no evidence supporting that the capabilities of a person who is legally blind due to a permanent condition are a matter of common sense or within the scope of a lay person's understanding. *See Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.)*, 169 F. Supp. 3d 396, 484 (S.D.N.Y. 2016) (". . . if the jury needs expert opinion because common sense will not suffice, it must come from an expert who is applying her expertise."); *see also United States v. Finley*, 301 F.3d 1000, 1013 (9th Cir. 2002) ("Our case law recognizes the importance of expert testimony when an issue appears to be within the parameters of a layperson's common sense, but in actuality, is beyond their knowledge.").

The Government treated the range of abilities expected of someone with Mr. Henderson's visual impairment as a matter that did not require expert testimony. To the contrary, the Court ruled prior to trial that many of the Government's

---

both eyes with best-corrected visual acuity of 20/400," ECF No. 28 at 7 (Dr. Harshman's diagnosis), has the same limitations as someone with "no eyeballs."

proposed "expert witnesses" failed to have the expertise based on which they could draw related conclusions. *See* ECF No. 131. In addition, there was evidence from Government witness Ms. Graham, a certified ophthalmic assistant for 21 years at the time of trial, that even she is "not absolutely certain what the standard for legal blindness is." ECF No. 224 at 30.

The Government's evidence of Mr. Henderson's isolated activities observed during the VA investigation in 2012 and 2013 does not support the conclusion that Mr. Henderson falsely reported his vision from 2002 to 2016. Accordingly, the Court finds that the Government failed to provide sufficient evidence upon which any rational jury could find beyond a reasonable doubt that Mr. Henderson made a false statement or concealed by any trick, scheme, or device a material fact. *See* 18 U.S.C. § 1001.

<u>Materiality</u>

Although the parties do not focus on materiality in their briefing and arguments, the Court notes that the materiality element of the false statement offense also is not supported by sufficient evidence. The Government identified Dr. Harshman's July 16, 2002 written diagnosis as Mr. Henderson's false statement and the point at which Mr. Henderson began "illegally receiving disability benefits." ECF No. 230 at 35. However, the evidence offered by the Government showed that on March 27, 2002, nearly four months before Dr. Harshman's diagnosis, the VA rated Mr. Henderson permanently unemployable

based on a combination of conditions totaling a ninety percent disability rating that

the agency had determined were unlikely to improve. Gov't Ex. 27; ECF No. 228

at 16–18 (Mr. David explaining that the March 27, 2002 grant of individual

unemployability involved a determination that the agency would pay the awarded

benefits "indefinitely, unless, obviously some evidence kind of comes up and

shows we shouldn't" ). The evidence also supports that in March 2002, the VA

already was paying Mr. Henderson as though he were rated 100 percent disabled,

even though he was rated ninety percent disabled. *See* ECF No. 228 at 18.

Given the timing of the VA's initial determination of individual

unemployability benefits and increase of payments at the 100 percent disabled rate

in March 2002, there is no evidence supporting that the VA relied on Dr.

Harshman's July 16, 2002 diagnosis, and Mr. Henderson's accompanying

statements in August 2002, in making the decision to grant the individual

unemployability and ancillary benefits. Therefore, Dr. Harshman's July diagnosis

and Mr. Henderson's August statements would not be material, because the VA

did not rely on them for their determination.

Intent

Finally, specific intent is an element in all three counts of conviction.

*Boone*, 951 F.2d at 1544 (false statement); *Morissette*, 342 U.S. at 270–71 (theft of

money).

The Government summarized its theory of specific intent at closing argument:

> So what happened on July 16, 2002, that is imperative? Defendant learned: I can make more money. If I have a permanent condition, I get more money. And motive, motive to get money is a huge thing.

ECF No. 230 at 29.

As stated above, neither Dr. Harshman nor the VA optometry intern who examined Mr. Henderson on July 16, 2002, testified, and there was no evidence presented or indication in the examination notes that Mr. Henderson learned that a certain visual acuity or a certain diagnosis relating to permanency would correspond to any given VA disability rating or any increased benefits awarded. *See* Gov't Ex. 9 at 18–20. Moreover, the Government provided no evidence that Defendant knowingly gave answers to manipulate the diagnostic exam upon which Dr. Harshman's assessment was based. Nor is there evidence that Mr. Henderson had knowledge that his responses would result in Dr. Harshman's diagnosis, which the Government identifies as Mr. Henderson's own false statement. Finally, there was no evidence presented that, when Mr. Henderson reported the diagnosis he had received, Mr. Henderson had any knowledge that the diagnosis was incorrect or that his report of the diagnosis was an unlawful act. However, as discussed above, there was testimony by Mr. David, the Government's witness, that in March 2002

the VA already had determined that Mr. Henderson should be paid as if 100 percent disabled and was individually unemployable.

The Government also emphasizes that Mr. Henderson did not inform the VA that a condition other than keratoconus could have been causing his vision impairment. However, there is no evidence or legal argument presented that Defendant was legally bound to report all possible medical causes of an impairment for which he claimed or received disability, or that Mr. Henderson could not reasonably rely on the diagnosis that he received from his VA doctor, Dr. Harshman, attributing his visual impairment to keratoconus. Rather, Mr. Henderson was obligated to report an improvement in his condition, and the evidence indicates that Mr. Henderson's condition was static. ECF No. 223 at 169–70 (the Government's covertly recorded exam with Dr. Johnson in 2013 revealed results similar to the results of Mr. Henderson's 2001 exam that precipitated his receipt of benefits).

Simply stated, the Government presented no evidence in its case-in-chief that Defendant willfully, that is deliberately and with knowledge that his statements were untrue and his conduct was unlawful, made any false statements in July or August 2002 or at any later point in the indictment period to seek increased benefits based on his visual acuity.

Without evidence, the jury would have had to rely on speculation to reach the conclusions that would satisfy the intent element, namely that Mr. Henderson

was fabricating the extent of his claimed visual impairment and that he could not engage in certain activities if he genuinely suffered from the permanent condition with which he had been diagnosed. *See United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc) (reciting that a judgment of acquittal is warranted when "evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element") (internal quotations omitted). Therefore, the Court finds that Mr. Henderson's motion for acquittal must be granted with respect to Count 3.

Counts 2 and 4 also lack the critical element of intent. *See United States v. Derington*, 229 F.3d 1243, 1249 (9th Cir. 2000) (citing *United States v. Morissette*, 342 U.S. 246, 270–71 (1952) (interpreting 18 U.S.C. § 641 to require that the violator of that provision knows that he is doing something unlawful)). The intent elements for the theft of money from the VA and the SSA were predicated upon the Government's proving beyond a reasonable doubt that Defendant "knowingly and willfully" stole the agencies' funds by making a false statement or concealing a material fact. *See* ECF No. 165 at 2. The record, both at the close of the Government's case-in-chief and at the close of trial, contains insufficient evidence to prove intent, an element of Counts 2 and 4, beyond a reasonable doubt. Therefore, the Court grants Mr. Henderson's motion for acquittal on Counts 2 and 4, theft of money from the SSA and the VA.

1    In conclusion, the Court finds that there was insufficient evidence presented

2    to prove the Government's case that Mr. Henderson willfully, that is deliberately

3    and with knowledge that the statement was untrue and that his conduct was

4    unlawful, made a false statement in order to obtain funds from the VA to which he

5    was not entitled.  Therefore, the Court grants Defendant's motion for acquittal on

6    all three counts.

7    ***Whether a new trial is warranted in the event that acquittal is overturned***

8        In the alternative, Mr. Henderson moves for a new trial pursuant to Fed. R.

9    Crim. P. Rule 33.  A court "may vacate any judgment and grant a new trial if the

10   interest of justice so requires." Fed. R. Crim. P. 33(a).  "A district court's power to

11   grant a motion for a new trial is much broader than its power to grant a motion for

12   judgment of acquittal." *United States v. Alston*, 974 F.2d 1206, 1212 (9th Cir.

13   1992).  "'The district court need not view the evidence in the light most favorable

14   to the verdict; it may weigh the evidence and in so doing evaluate for itself the

15   credibility of the witnesses.'" *Id*. (quoting *United States v. Lincoln*, 630 F.2d 1313,

16   1319 (8th Cir. 1980)).  "'If the court concludes that, despite the abstract sufficiency

17   of the evidence to sustain the verdict, the evidence preponderates sufficiently

18   heavily against the verdict that a serious miscarriage of justice may have occurred,

19   it may set aside the verdict, grant a new trial, and submit the issues for

20   determination by another jury.'" *Id*. (quoting *Lincoln*, 630 F.2d at 1319).  Thus,

21   although the Court's discretion is broad, a new trial should be granted "'only in

exceptional cases in which the evidence preponderates heavily against the verdict.'" *United States v. Showalter*, 569 F.3d 1150, 1157 (9th Cir. 2009) (quoting *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981)).

The Court finds in this case that the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, and a new trial is necessary if the Court's ruling of acquittal is overturned.

Clinton David's Testimony

Before trial, the Government disclosed VA Ratings Specialist Clinton David as an expert on the VA disability ratings process and to explain the conclusions reached by the administrative process with respect to Mr. Henderson. ECF No. 12-2 at 344–45. The Court allowed Mr. David's testimony for purposes of the VA ratings process only. However, Defendant argues that at trial the Government elicited testimony from Clinton David on direct examination that crossed the line into impermissible vouching that violated due process protections. ECF No. 257.

Defendant objects to the fact that Mr. David editorialized liberally throughout his testimony about the history of the VA, the VA ratings system, his own work with the VA, and, in particular, the ratings determinations that affected Mr. Henderson. Mr. David's introduction to the VA was particularly expansive:

> After the Civil War, there were a lot of veterans and especially widows that were displaced because the gentleman died, you know. So the Government, collectively us, decided that we wanted to take care of these people.

So Abraham Lincoln made this promise to society, basically. And this is still kind of our code. Despite what you see in the newspapers, we really do try to follow it.

And it's really basically simple. It says that if you bear the burden of a battle, that we will protect you, we'll protect your siblings—sorry—your children and your spouse.

And that's really the purpose of what my work is, is to attach a disability benefit—and it could be a form of money, it could be a form of education, um, could be a form of housing—to a veteran who offered up his services to our country. And we continue to this day.

. . .

So we're unlike other agencies. Other agencies will have kind of an adversarial nature, you might notice, where their loyalty is really to the taxpayer. And so they'll question every little thing that a claimant submits to them and tries to pursue with them.

But, really, our client is the veteran. And we have a fiduciary duty to the taxpayer to make sure that we serve the veteran, our client, you know, as well as we can.

. . .

So we don't have an adversarial position. We don't have a very good system of checks and balances that, you know, keeps them on the straight and narrow. We really rely on the veteran.

ECF No. 226 at 187–88. Mr. David spoke of the administrative process that resulted in a termination of some of Mr. Henderson's vision-related benefits as a "fraud case," ECF No. 226 at 106, in which the VA reached a conclusion based on a "clear and unmistakable error standard," without an explanation of what that standard means, that Mr. Henderson had violated a regulation that governs fraud, ECF No. 228 at 112–13.

ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY A NEW TRIAL ~ 47

Even with the Court's sustaining defense counsel's objections to Mr. David's overly expansive testimony, the Court agrees that Mr. David's testimony was unduly prejudicial, and that his testimony likely confused the jury regarding the significance of the administrative decision to terminate Mr. Henderson's benefits in the context of the Government's burden of proving beyond a reasonable doubt as to whether Mr. Henderson made a false statement.

New Evidence

Defendant also seeks a new trial based on evidence that did not exist at the time of trial, in the form of the VA's alternating determinations as to whether or not Mr. Henderson qualified for individual unemployability status. The VA initially found Mr. Henderson individually unemployable on March 27, 2002. Gov't Ex. 27. Then, in July 2015, the VA changed their determination to find that Mr. Henderson did not qualify as individually unemployable. Gov't Ex. 33. After the trial concluded in September 2017, the VA reversed course again and reinstated Mr. Henderson as individually unemployable in February 2018. ECF No. 258-1. Finally, in May 2018, after defense filed motions for acquittal and a new trial, the VA reversed yet again, reverting to denying Mr. Henderson as individually unemployable and citing the jury's September 2017 verdict as one of the bases on which the VA made its determination. ECF No. 269-1. Presumably, the VA made all of these determinations applying the "clear and unmistakable error standard" that Mr. David testified that the VA follows. ECF No. 228 at 112.

To warrant a new trial based on newly discovered evidence, a defendant must satisfy the following criteria: (1) the evidence is newly discovered; (2) the defendant exercised due diligence in uncovering the new evidence; (3) the new evidence is not merely cumulative or impeaching; (4) the new evidence is material; and (5) the new evidence is such that a new trial would probably produce an acquittal. *United States v. Jackson*, 209 F.3d 1103, 1106 (9th Cir. 2000).

The May 1, 2018 VA decision revoking the VA's February 2018 determination that Mr. Henderson's individual unemployability status should be reinstated back to March 11, 2002, was issued the same day that the VA purportedly received the "jury verdict" from the instant matter. ECF No. 269-1 at 4. In the May 1, 2018 determination, the VA stated that in making its latest decision regarding Mr. Henderson's benefits, the VA considered the jury's guilty verdict in this case, which was reached in September 2017, and the "great lengths that the Prosecution went to address impact [sic] of [Defendant's] service connected disabilities on [his] occupational functioning to include [his] eye condition and headaches, and inconsistent reports about the severity of them used to support medical and employment findings." ECF No. 269-1 at 13. However, it is unclear from the VA's written decision how the VA was aware of the "great lengths" to which the Government went in making its case against Mr. Henderson or how the VA became familiar with that information or weighed that factor.

1    In analyzing the four factors for determining whether a new trial is

2    warranted because of new evidence, the Court finds that the May 1, 2018 VA

3    determination was newly discovered, and that the defendant could not have

4    uncovered the May 1, 2018 determination at the time of his trial in September

5    2017.  In addition, the Court finds that the new evidence, the May 1, 2018 VA

6    determination, is not merely cumulative or impeaching, but could be considered

7    material to the issues in the case.  The Court views the last factor, whether the new

8    evidence is such that a new trial would probably produce an acquittal, as

9    speculative at this point.  Nevertheless, the VA's post-trial reinstatement of

10   individual unemployability status and benefits, followed by a retraction of that

11   determination that referred to the jury's verdict and the Government's case,

12   supports the conclusion that a new trial is warranted.

13          Prosecutorial Error

14          Defense argues, and the record supports, that the Government characterized

15   some of the evidence in ways that arguably were misleading.  Defense objected

16   many times to the Government's questions and statements during closing

17   argument.  The Court sustained many of defense's objections.  The transcript

18   speaks for itself regarding the Government's statements and the Court's rulings,

19   especially during closing argument.  *See* ECF No. 230 at 53, 57, 107 and 110.

20          Despite the Court's sustaining defense's objections and repeatedly

21   reminding the jury that the jury's recollection of the evidence is controlling and

that the attorneys' closing remarks are argument, not evidence, the Court concludes

that there were abundant opportunities for the jury to become confused. The Court

concludes that the number of defense's objections sustained by the Court also

warrants a new trial.

In addition, before trial began, the Court granted a motion by Mr. Henderson

on "deservedness," seeking to avoid having the Government convert Mr.

Henderson's trial about the criminal charges brought against him into an

opportunity for the jury to judge the appropriateness of awarding VA benefits in

cases like Mr. Henderson's case. ECF Nos. 112; 139 at 3. However, the

Government raised that issue repeatedly both through its questions and in its

closing argument. *See, e.g.,* ECF No. 230 at 109–10.

### Bulk of Evidence Preponderates Against Verdict

In addition to hearing the evidence alongside the jury at trial, the Court has

exhaustively reviewed the evidence contained in the trial record, as highlighted by

both parties in the extensive briefing on the post-trial motions, and has reviewed

the new evidence generated by the VA after the trial. As indicated by the Court's

conclusions regarding the lack of evidence supporting essential elements of the

counts of conviction, the Court concludes that the weight of the evidence in this

matter does not support the verdict. *See United States v. Kellington*, 217 F.3d

1084, 1097 (9th Cir. 2000) (finding district court acted within its discretion when it

granted a new trial upon a determination that there was no direct evidence of

defendant's mental state).

## CONCLUSION

The jury had an exceptionally difficult task in this case, as evidenced by the

lengthy briefing on the motion for acquittal and the length of this Court's order in

resolving the issues involved.  Extra factors contributed to making the jury's task

of understanding the evidence even more difficult than usual.  Even with great

deference to the jury's verdict, and viewing the evidence in a light most favorable

to the Government, the Court finds insufficient evidence to prove all of the

essential elements of Count 3 beyond a reasonable doubt.  Likewise, the Court

finds insufficient evidence of intent for Counts 2 and 4.  Therefore, the Court

grants Mr. Henderson's motion for acquittal on Counts 2, 3, and 4.

In the event that the Court's ruling of acquittal is vacated, the Court finds

that the ample opportunity for confusion and conflation that permeates the record

in this matter supports that a miscarriage of justice may have occurred when Mr.

Henderson was convicted.  Therefore, a new trial is warranted if this matter were

remanded to the District Court.

Accordingly, **IT IS HEREBY ORDERED**:

1.      Defendant's Motion for Acquittal, or, in the Alternative, for a New

Trial, **ECF No. 241**, is **GRANTED**.

2.     Defendant's Supplemental Motion for New Trial, **ECF No. 257**, is **GRANTED**.

3.     Defendant's Motion for New Trial Based on Newly-Discovered Evidence, **ECF No. 258**, is **GRANTED**.

4.     Defendant is acquitted of Counts 2, 3, and 4.  Judgment of acquittal shall be entered.

The District Court Clerk is directed to enter this Order and provide copies to counsel.

**DATED** June 27, 2018.

_s/ Rosanna Malouf Peterson_
ROSANNA MALOUF PETERSON
United States District Judge